JOHN J. DENNIS vs. RICK KASKEL.

No. 09-P-1826.

Middlesex. September 13, 2010. - July 6, 2011.

Present: McHUGH, KATZMANN, & VUONO, JJ.

*Loan. Contract,* Performance and breach, Loan, What constitutes. *Practice, Civil,* Summary judgment.

In a civil action claiming damages arising out of breach of contract, the judge erred in granting summary judgment in favor of the plaintiff, where genuine issues of material fact existed whether the parties ever agreed to the terms of a memorandum, and even if they did agree, whether the terms of the memorandum were sufficiently certain to create a binding contract. [740-744]

CIVIL ACTION commenced in the Superior Court Department on January 31, 2007.

The case was heard by *Bonnie H. MacLeod-Mancuso,* J., on a motion for summary judgment, and entry of final judgment was ordered by her.

*Christopher E. Hultquist* for the defendant.

*Thomas J. Freda* for the plaintiff.

McHUGH, J. John J. Dennis sued Rick Kaskel in Superior Court to recover what he claimed were damages arising out of Kaskel's breach of contract. A judge of that court allowed Dennis's motion for summary judgment on liability, and after a separate hearing on damages, ordered entry of judgment in Dennis's favor. Kaskel appeals, claiming principally that genuine issues of material fact require a trial and that disposition by summary judgment was inappropriate. We agree and therefore reverse.

Viewed in the light most favorable to Kaskel, see, e.g., *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991), it appears that in early 2001, Kaskel was presented with an

opportunity to become a "market partner" with Texas Road-house Holdings, LLC (Texas Roadhouse), a national restaurant chain. The record does not fully reveal the duties of a market partner, but it appears that those duties centered on opening new Texas Roadhouse restaurants and ensuring that they ran smoothly. According to the employment agreement between Kaskel and Texas Roadhouse Management Corp. (employment agreement), Kaskel's compensation was to consist of a salary, bonuses, and stock options. The salary was $55,000 annually, later increased to $75,000. The bonuses amounted to eight percent of the "pre-tax income" of each restaurant for which Kaskel was responsible.

Acceptance of the opportunity required Kaskel to invest $50,000 in Texas Roadhouse in two equal instalments of $25,000, the first payable when Kaskel executed the employment agreement and the second due upon the opening of the second restaurant for which he was responsible. The employment agreement provided that Texas Roadhouse would hold the money and make it available to Kaskel so that he could buy the first $50,000 worth of Texas Roadhouse stock options he elected to purchase under a Texas Roadhouse stock option plan.[1]

Kaskel did not have the needed $50,000, so he approached Dennis, a business acquaintance, for a loan. On or about February 1, 2001, after considering Kaskel's request, Dennis wired Kaskel $25,000 together with a "Memorandum" (memorandum) that, in pertinent part, read as follows:

> "John Dennis shall wire funds in the amount of $25,000.00 from his personal bank account to the . . . account [of Rick Kaskel] for the sole purpose of entering into an agreement with Rick Kaskel whereby John Dennis shall enjoy a percentage of the benefits that shall accrue to Rick Kaskel as a result of his position as a market partner with Texas Roadhouse — those benefits are more fully described below.
>
> " . . .

---

[1] The employment agreement provided that the timing and amount of options available to Kaskel were committed to the Texas Roadhouse directors' sole discretion. Unused portions of Kaskel's deposit were to be returned to him when his employment ended. The stock option plan itself is not part of the record.

"The benefits that shall accrue to John Dennis as a result of this investment of $25,000 and the subsequent investment of an additional $25,000, as may be required by Texas Roadhouse, shall be as follows:

"— A continuing interest equal to 22.5% of the annual operating bonus payable to Rick Kaskel for each store in which Rick Kaskel is involved.

"— 22.5% of any stock options which Rick Kaskel is granted by Texas Roadhouse.

"It is the stated intent to enter into a legally binding agreement that shall be constructed by an attorney(s) on behalf of John Dennis and Rick Kaskel which incorporates the above business terms not later than February 23, 2001. If such an agreement has not been signed by that time, John Dennis shall have the option to extend the time for such an agreement or demand repayment of the $25,000 investment which Rick Kaskel agrees to reimburse within (7) days of notification."

At their depositions, Dennis and Kaskel provided conflicting testimony regarding whether Kaskel ever signed the memorandum, but no signed memorandum was produced at any point during the litigation.[2]

On February 2, 2002, about a year later, Dennis wired the second instalment of $25,000 to Kaskel. To fulfil his obligations under the employment agreement, Kaskel deposited both instalments with Texas Roadhouse.

In March, 2002, Dennis tendered to Kaskel a proposed agreement (agreement) ostensibly designed as the "legally binding agreement" contemplated by the memorandum. The agreement, fourteen single-spaced pages in length, called for creation of an entity called Boston Roadhouse, LLC (Boston Roadhouse). Leading off with three pages of definitions, the agreement pro-

---

[2]Among their many disagreements, the parties disagree whether the funds Dennis advanced were a loan. Kaskel says they were, but Dennis characterizes the advances as an equity investment in Kaskel's business relationship with Texas Roadhouse, which Dennis expected to produce a relatively small annual salary for Kaskel plus large bonuses and stock options in which Dennis would participate.

vided that Kaskel would own 77.5 percent of Boston Roadhouse and Dennis would own the balance. After Boston Roadhouse was created, Kaskel would deliver to Boston Roadhouse all the stock, dividends, and bonuses he received from Texas Roadhouse. There would be voting and nonvoting "members" of Boston Roadhouse, the former of which could be individuals, corporations, partnerships, or limited liability companies, and all memberships would be transferable. The "managers," not otherwise defined, of Boston Roadhouse could make calls for additional capital contributions. If a member did not respond, then any other member could make a loan to Boston Roadhouse to cover the member's share of the call, and Boston Roadhouse would be obliged to repay the loan at the rate of eighteen percent per annum. Boston Roadhouse would make periodic distributions to members in accordance with a complicated formula that stretched across two full pages of the agreement. The agreement also prohibited Kaskel from engaging in any future business transaction with Texas Roadhouse except through Boston Roadhouse.

After about a year of discussing and considering different drafts of the agreement, none of which was ever signed or otherwise agreed upon, Dennis sent an electronic mail message (e-mail) to Kaskel in February, 2003, requesting a meeting to "finalize" the original draft, a copy of which he attached to his e-mail. The same day, Kaskel sent by e-mail a response saying that the agreement was "way too complicated" and promising to telephone Dennis promptly to "set up a meeting to discuss [the] financial loan."

At some point thereafter, Kaskel sent Dennis an e-mail to express a desire for an arrangement that was "equitable for both of [them], since [Dennis had] taken the risk with the money and [Kaskel had] made the commitment of spending [his] life the last 2 years and for the foreseeable future in [the] restaurants each and every day 24/7 insuring their success." Kaskel's e-mail continued with a description of his anticipated cash flow over the next few months. He closed with several points he wanted to discuss with Dennis, including "some sort of graduated repayment schedule that increases to a cap as new restaurants come on board," "the potential of poor payback and high risk of using Stock Grants in the agreement due to Option Strike Prices

and poor Stock Market conditions," and factoring "in Net Bonus payouts (Not Gross) and the highly taxable rate of Bonus Payouts."

Again, a series of exchanges ensued and again the exchanges failed to produce agreement. Finally, Dennis brought suit seeking to enforce the terms of the initial memorandum. After a period of discovery, a judge of the Superior Court, in a thoughtful memorandum of decision, allowed Dennis's motion for summary judgment on contractual liability and then held a hearing to assess damages.[3] Based on the amount of income reflected on Kaskel's Federal income tax W-2 forms for the years 2001 through 2007, the judge determined that Kaskel owed Dennis a total of $791,254.20 plus interest, an amount that represented 22.5 percent of Kaskel's bonus and stock-option income of $3,516,685.32 during that period.[4] In addition, the judge ruled that Kaskel owed Dennis "the amount, if any, of any bonus or stock option granted and/or exercised to by Kaskel, in any year after December 31, 2008, from Texas Roadhouse . . . ."

On appeal, Kaskel argues that genuine issues of material fact precluded summary judgment on liability and that, even if the issue of liability were somehow appropriate for resolution without trial, damages in excess of $25,000 were unwarranted. As we observed at the outset, we think that the record does reveal unresolved and material issues of fact.

Faced with allowance of a motion for summary judgment, we review the record de novo. See *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007). In doing so, we look to see "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. at 120. See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). In that context, a dispute about a material fact is "genuine" when "the evidence is such

---

[3]The complaint contained three counts, one alleging breach of contract, one alleging promissory estoppel, and the third alleging quantum meruit. Summary judgment was granted only on the breach of contract count.

[4]Interest amounted to another $255,503.41 and was calculated on a theory that Kaskel should have paid Dennis 22.5 percent of the income shown on his annual W-2 forms, minus the amount of the salary included in that income, on December 31 of the year each W-2 form covered.

that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party may meet its burden of showing the absence of a genuine issue of material fact either through affirmative evidence or by showing an absence of evidence to support an essential element of the nonmoving party's claim. See *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991). See also *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986).

The question lying at the heart of this appeal is whether the memorandum that accompanied Dennis's initial $25,000 advance amounted to an enforceable contract.[5] "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000). "While it is not necessary that every term of the agreement be specified with precision, '[t]he parties must . . . have progressed beyond the stage of imperfect negotiation.'" *Lambert* v. *Fleet Natl. Bank*, 449 Mass. 119, 123 (2007), quoting from *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, *supra.* Whether they have done so ordinarily is a question of fact, see *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 239 (1979), and so it is here.

First of all, there is a genuine issue of material fact whether Dennis and Kaskel ever agreed to the terms of the memorandum. Their deposition testimony differed on that question, and no signed copy of the memorandum ever materialized during the course of discovery.

Even if they had agreed, though, there is a genuine issue of material fact whether the memorandum was a binding contract, i.e., an expression of their agreement as to all material terms of their agreement or simply an agreement to principles that were to guide further negotiations. In that regard, the memorandum states that "[i]t is the stated intent to enter into a legally binding

---

[5]Dennis does not argue, nor could he on this record, that Kaskel ever agreed to the proposal that Dennis advanced for the creation of Boston Roadhouse.

agreement that shall be constructed by an attorney(s) on behalf of John Dennis and Rick Kaskel." To be sure, a statement in an agreement that the parties intend to execute a subsequent agreement does not always mean that the initial agreement is unenforceable. See *Goren* v. *Royal Invs. Inc.*, 25 Mass. App. Ct. 137, 140 (1987). However, "language looking to execution of a final written agreement justifies a strong inference that significant items on the agenda of the transaction are still open and, hence, that the parties do not intend to be bound." *Ibid.*, citing *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935). Accord, *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prods., Inc.*, 283 Mass. 383, 387 (1933); *Levenson* v. *L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 130 (1991). See generally Restatement (Second) of Contracts § 27 (1981). That strong inference is made even stronger in this case by the language with which the memorandum ends, language stating that Dennis and Kaskel intended to "enter into a legally binding agreement" within three weeks and, if they did not, Dennis would have the option to extend the time for doing so or to demand immediate repayment of the $25,000 he had advanced. Such language is wholly inconsistent with the view that either party intended the memorandum itself to be a contract that bound them.

Under ordinary circumstances, Kaskel's retention of the first instalment of $25,000 and his acceptance of the second instalment a year later might be strong, perhaps conclusive, evidence that he accepted the terms the memorandum contained. See *Polaroid Corp.* v. *Rollins Envtl. Servs.*, 416 Mass. 684, 691 (1993); *Massachusetts Hous. Fin. Agency* v. *Whitney House Assocs.*, 37 Mass. App. Ct. 238, 241 (1994); Restatement (Second) of Contracts § 19. In deciding whether a contract was formed, however, "[w]ords and other conduct are interpreted in the light of all the circumstances," Restatement (Second) of Contracts § 202(1), because "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." *Id.* at § 202(1) comment g, at 90. See Restatement (Second) of Contracts § 20 comment c, at 59-60 (principles contained, inter alia, in § 202, are applicable to contract formation as well as to contract interpretation). Here, there is equally strong evidence that Dennis

himself did not view the memorandum as the embodiment of the parties' final agreement. That evidence takes the form of the proposal for the creation of Boston Roadhouse that Dennis tendered to Kaskel shortly after Dennis tendered the second $25,000 instalment. That proposal, which no reasoning person could view as the simple addition of detail to a structure the memorandum fully embodied, and the two years of negotiations that followed are strong evidence that Dennis himself viewed the memorandum as simply the first step in negotiations ultimately designed to yield a completed contract.

But even if the memorandum were interpreted as a firm offer, and not the opening for a round of negotiation, and even if Kaskel agreed to the memorandum, there is, at the least, a genuine issue of material fact whether its terms were sufficiently certain to create a contract. See Restatement (Second) of Contracts § 33(1). First, the memorandum does not address the duration of Dennis's entitlement to 22.5 percent of Kaskel's bonuses and stock options. The omission is particularly significant in light of Kaskel's claim that he asked for and received a loan and Dennis's claim that, although Kaskel did ask for a loan, they wound up forming a business agreement in perpetuity.

Beyond thematics, there are significant issues of detail. The memorandum does not indicate whether Dennis's 22.5 percent of the Kaskel's bonus payments, which are taxable income to Kaskel, is to be calculated before or after taxes, a question of no small significance given the amounts involved. Moreover, the memorandum neither indicates whether the 22.5 percent of Kaskel's stock options is to be determined on the basis of the number of options, the strike price, or the price at which Kaskel sells the shares, nor does the memorandum say anything about who is entitled to what dividends while Kaskel holds the shares. Moreover, the memorandum does not indicate when Kaskel's obligation to pay Dennis his share of the options' value arises or, as in the case of the bonus payments, whether he owes Dennis a percentage of the pre- or posttax amount he realizes.[6]

The unresolved factual issues outlined above may mean that,

---

[6]Kaskel claims that even if the memorandum created a contract, Dennis's remedy for a breach was limited by the language in the memorandum giving Dennis the option either to demand his money back if he and Kaskel could

in the end, Dennis and Kaskel never reached sufficient agreement to produce a contract. But whether they did is a question for resolution by a fact finder, not for resolution on summary judgment. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

not agree on a "legally binding agreement" within three weeks or to extend the time for doing so. By its terms, however, that limitation applies only if there was no contract. If a fact finder determines that the memorandum was a contract, then the limiting language is inapplicable. If, on the contrary, the memorandum was not a contract, then the fact finder will have to determine the role the parties intended the limiting language to play and the impact, if any, that role has on the counts of the complaint alleging promissory estoppel and quantum meruit.