ENGLANDER, J.
*654 This is an attorney malpractice action. The plaintiff, Kenneth D. Jenkins, claims that his attorney was negligent in negotiating the stock buy-back clause (clause or buy-back clause) in Jenkins's employment agreement with his new company, Apollo Security International, Inc. (Apollo).[2] Jenkins claims that the clause contained in the employment agreement did not comport *655 with the instructions he gave to his attorney, and that as a result he was damaged when, upon his termination from Apollo, he received an inadequate payment from Apollo for his Apollo stock. A Superior Court judge granted summary judgment for the defendants, reasoning that Jenkins had failed to adduce facts from which a fact finder could find either a breach of the standard care, or causation. We affirm.
Background. In 2003, Jenkins entered into negotiations with Apollo with a view toward joining the company as its president and chief operating officer. Apollo provided security services to businesses. As of 2003 Jenkins was working as a regional president for Pinkerton Security, and he had decades of experience in the security business.
The principal of Apollo was Dennis Crowley. Crowley and Jenkins were friends, having worked together in the security industry years earlier. Crowley and Jenkins worked out the basics of Jenkins's compensation, which included a salary and a percentage of Apollo's stock. Because Apollo was privately owned, Jenkins and Crowley agreed that if Jenkins were terminated, Apollo would buy back Jenkins's stock from him.
Jenkins retained David Bakst, of the law firm of Morrison Mahoney LLP (Morrison), to represent him in the negotiation and drafting of his employment agreement.[3] The point of contention in this case is the clause in the employment agreement that defined how Jenkins's stock would be valued upon buy-back; Jenkins's position is that he told Bakst he wanted to receive fair market value for the stock, and that Apollo's fair market value should be measured by a percentage of Apollo's annual revenues -- "anywhere from 25 to 35 percent or some numbers like that." The buy-back clause in the employment agreement, however, did not establish fair market value based on a percentage of annual revenues. Rather, it provided for valuation by an entirely different approach, an approach *202 Bakst had suggested during the negotiations.[4] *656 Jenkins left Apollo ten years later, in 2013. When he left, Apollo obtained appraisals under the employment agreement's valuation method that valued Jenkins's stock at approximately $200,000. Jenkins, on the other hand, claimed that he should have received at least $1.6 million for his stock, and perhaps as much as $3.4 million.[5] Notably, Jenkins did not seek either to mediate or to arbitrate the buy-back amount (arbitration was provided for in the employment agreement). Apollo requested arbitration, but before any hearing, Jenkins agreed to settle his claims with Apollo for $1 million.
Jenkins brought this suit against Bakst and Morrison in 2015. The gist of his claim is that he told Bakst that the employment agreement's fair market value formula should value Apollo at between twenty-five and thirty-five percent of annual revenues, and that Bakst failed to follow his instructions. After discovery, the defendants moved for summary judgment, which the motion judge granted in a thoughtful decision. She ruled that on the undisputed material facts a fact finder could not find, either (1) that the defendants breached the standard of care, or (2) that the alleged breach caused Jenkins any injury.
Discussion. 1. The summary judgment standard and record. The summary judgment standard is contained in Mass. R. Civ. P. 56, 365 Mass. 824 (1974). On motion by a party, if the "pleadings, depositions, answers to interrogatories, and responses to requests for admission under Rule 36, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then summary judgment shall be rendered forthwith. Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). In ruling on a summary judgment motion, the judge views the evidence and all reasonable inferences therefrom, "in the light most favorable to the nonmoving party." Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 475, 984 N.E.2d 286 (2013). See *657 Coveney v. President & Trustees of the College of the Holy Cross, 388 Mass. 16, 17, 445 N.E.2d 136 (1983). "We review a grant of summary judgment de novo." Merrimack College v. KPMG LLP, 480 Mass. 614, 619, 108 N.E.3d 430 (2018).
Applying these standards, the record before us shows the following: before Bakst entered into any negotiations with Apollo, Jenkins told Bakst that he wished to receive fair market value for his shares, and that fair market value should be measured at twenty-five to thirty-five percent of annual revenue. Bakst thereafter negotiated *203 the buy-back clause with Apollo's general counsel, Richard Bickelman. Bakst was provided two relevant documents: the first was a draft employment agreement that Bickelman had prepared, which provided for buy-back of Jenkins's stock at book value. In addition, Bakst was provided an already-existing agreement between Apollo and two other shareholders, which provided for buy-back by valuing Apollo at two months of the average annual revenues (16.6 percent of annual revenues).
Bakst and Bickelman discussed the buy-back valuation provision on June 11, 2003, the day before Jenkins signed the employment agreement.[6] Bickelman told Bakst that he sent the existing stockholder agreement -- which established Apollo's value based on two months of revenues -- as a sample for Jenkins to consider. Bakst told Bickelman that Jenkins would accept only a valuation based upon fair market value, not book value, and that Jenkins believed that Apollo's fair market value should be equal to four months of revenues (thirty-three percent), not two months as in the existing agreement with the other stockholders. During this conversation Bakst also suggested and explained an alternative method for establishing Apollo's fair market value (alternative valuation method). Bakst explained that he had used this alternative valuation method in agreements for other clients. The record does not establish whether Bickelman explicitly rejected the four months proposal, but it is undisputed that Bickelman did not accept it, and it is also undisputed that he told Bakst he preferred Bakst's alternative valuation method.
Jenkins's employment agreement was signed on June 12, 2003. It provided for transfer of 2,300 shares of stock to Jenkins, and further provided that if Jenkins left Apollo after more than three years, Apollo would buy back Jenkins's stock at fair market value. [7]
*658 Fair market value was defined in accordance with the alternative valuation method proposed by Bakst.
Jenkins read the employment agreement before signing it, and he initialed the pages that contained Bakst's alternative valuation method. Bakst testified that he had described the alternative valuation method to Jenkins, before Bakst proposed the alternative valuation method to Bickelman. Importantly, Jenkins testified that he could not remember his conversations with Bakst prior to signing the employment agreement. He therefore could neither affirm nor dispute Bakst's testimony that he explained the alternative valuation method to Jenkins in advance.
2. The attorney malpractice claim. To establish a claim for legal malpractice Jenkins must demonstrate that his attorney, Bakst, (1) "failed to exercise reasonable care and skill in handling the matter for which the attorney was retained," (2) "that the client has incurred a loss," and that (3) "the attorney's negligence is the proximate cause of the loss." Kiribati Seafood Co., LLC v. Dechert LLP, 478 Mass. 111, 117, 83 N.E.3d 798 (2017), quoting Global NAPs, Inc. v. Awiszus, 457 Mass. 489, 500, 930 N.E.2d 1262 (2010).
*204 As indicated, Jenkins's theory is that Bakst failed to exercise due care because he did not follow Jenkins's instructions, which were to obtain a definition of fair market value for Apollo equal to twenty-five to thirty-five percent of annual sales. It is a straightforward theory, but it fails on the facts adduced. While the employment agreement did not contain the clause that Jenkins initially wanted, there is no evidence that Jenkins did not agree to the clause that was finally placed in the employment agreement. Jenkins is an experienced businessperson, and it is undisputed that he read the employment agreement, initialed the relevant pages, and then signed it. Moreover, Jenkins does not and cannot (given his testimony) contradict Bakst's testimony that Bakst explained the alternative valuation method to Jenkins before he signed.[8]
On these facts Jenkins cannot establish a breach of the attorney's *659 standard of care. Jenkins's claim amounts to the assertion that he desired a particular outcome in negotiations, and that he advised his attorney of his desires, before negotiations commenced. But an attorney is not a guarantor of a particular result in negotiations, and the failure to achieve a particular result is not malpractice. See Meyer v. Wagner, 429 Mass. 410, 419, 709 N.E.2d 784 (1999). The case would be different if Jenkins claimed that his counsel misled him as to the meaning of the employment agreement, or concealed the language or meaning from him. But Jenkins does not make such claims, as he disavows any memory of his conversations with Bakst about the employment agreement's actual language. The fact that Jenkins read the agreement before signing, and Bakst's testimony that he advised Jenkins about the alternative valuation method before Jenkins signed (which is not disputed by Jenkins), means that here there is no genuine issue whether Bakst met the standard of care.
We note as well that Jenkins's claim is unsupported by any expert testimony. The Supreme Judicial Court has stated that "[e]xpert testimony is generally necessary to establish that the attorney failed to meet the standard of care owed by an attorney in a particular case." Pongonis v. Saab, 396 Mass. 1005, 1005, 486 N.E.2d 28 (1985). See LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 329, 974 N.E.2d 34 (2012). The exceptions to this rule involve situations where a lawyer's failures are so obviously negligent that the negligence would fall within the knowledge of a lay fact finder -- for example, the failure to meet a filing deadline. See Global NAPs, Inc., 457 Mass. at 501, 930 N.E.2d 1262 (expert testimony not required where attorney did not file timely notice of appeal and made no showing of excusable neglect). But that is not this case, which involves legal skill and judgment as to the drafting and negotiation of a sophisticated clause in a contract. Notably, Jenkins does not claim that the alternative valuation method Bakst employed somehow fell below professional standards.
Jenkins's brief emphasizes that there were factual differences between his testimony and Bakst's testimony, and argues that those differences necessarily meant that summary judgment must be denied. For example, Jenkins asserts that he told Bakst that "he (Jenkins) wanted a fair *205 market value valuation which he (Jenkins) defined as between 25 [percent] and 33-1/3 [percent] of annual gross revenues." Jenkins points out that Bakst "[d]isputed" this asserted fact. Jenkins then argues that this dispute means, as matter of law, that summary judgment had to be denied. *660 Jenkins's argument contains a common misconception about summary judgment practice, which is that any dispute about a fact that is part of the narrative of the case necessarily precludes summary judgment. Not so. The dispute must be about an issue of "material" fact; the dispute is not "material" if one can assume the facts as contended by the nonmoving party, and on those assumed facts the moving party still must prevail as a matter of law. Dennis v. Kaskel, 79 Mass. App. Ct. 736, 741, 950 N.E.2d 68 (2011), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[A] fact is 'material' when it 'might affect the outcome of the suit under the governing law' "). Here, the dispute Jenkins highlights is not material. Even assuming that Jenkins told Bakst that he wanted a fair market valuation method using twenty-five to thirty-five percent of revenues, he cannot show a breach of the duty of care given the remaining undisputed facts, which include that Jenkins read and signed the employment agreement, and that Jenkins had no memory of any subsequent conversations with Bakst regarding the valuation method in the employment agreement.[9]
Summary judgment was appropriate for a second reason as well, which is that Jenkins cannot establish causation of injury from the alleged malpractice. Even assuming that Bakst failed to meet the required standard of care because he failed to adequately negotiate for the fair market value formula that Jenkins desired, Jenkins would still have to show that it was more likely than not that Apollo would have accepted his proposed formula. There were two parties to the negotiation; absent Apollo's agreement to Jenkins's proposal, Jenkins could not have received the value that he wanted, and could not have been damaged. See Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg, 428 N.W.2d 288, 290 (Iowa 1988).
The evidence falls short of showing that Apollo likely would have agreed to Jenkins's proposal. The only person from Jenkins's side who had knowledge of the fair market valuation negotiations *661 was Bakst; it is undisputed that Jenkins himself never negotiated the fair market value formula. As for Bakst, the only evidence of what he knew about what Apollo would have accepted comes from his negotiations with Bickelman. That evidence suggests that Apollo would have accepted the formula based on two months of revenues. There is no evidence, however, that Apollo would have accepted the formula Jenkins was seeking, which was based on three months or four months of revenues. Indeed, the only evidence on that issue is that Bickelman did not agree to four months, and instead opted for Bakst's alternative valuation *206 method. Those facts cannot suffice to conclude that Bakst knew or should have known that Apollo would likely have accepted a valuation methodology that was greater than two months' revenues. The motion judge properly granted summary judgment based on the causation issue as well.[10]
Judgment affirmed.

The claim against Morrison Mahoney LLP is framed as respondeat superior.

Initially Jenkins retained Bakst to advise him on the potential impact of a noncompete clause in his Pinkerton employment contract, but Jenkins later expanded the representation to include his employment agreement with Apollo.

The clause stated: "The Fair Market Value of the Company shall be equal to (a) its Balance Sheet Net Worth (as defined hereinafter) as of the last day of the month preceding that in which the event that shall cause the need to determine such Fair Market Value (the "Valuation Date") shall occur plus (b) the Fair Market Value of the customer list, customer account files and records and all goodwill applicable thereto (the "Customer Goodwill") that the Company may own as of the Valuation Date."

The $1.6 million figure corresponds to 16.6 percent, or two months, of annual sales. Using twenty-five percent (three months) of annual sales, Jenkins apparently would claim that his shares were worth approximately $2.5 million.
There is some confusion in the briefing because Jenkins's theory of how Apollo should be valued is sometimes stated as a percentage of annual sales, and sometimes as a number of months of sales. Thirty-three percent would correspond to four months of annual sales. Twenty-five percent would correspond to three months. Sixteen point six percent is two months.

The negotiation process was accelerated because the parties to the employment agreement, Jenkins and Apollo, wished to disclose Jenkins's employment at an upcoming meeting of Apollo managers.

The clause provided that if Jenkins left or was fired for cause during the first thirty-six months, he would receive only book value for the shares. After three years Jenkins would receive fifty percent of the fair market value of his shares, and the price would increase by ten percent for each additional year that Jenkins remained employed with Apollo.

Notably, Jenkins did not testify that he told Bakst that his (Jenkins's) fair market value formula was a required term of any deal. Indeed, his description at deposition of what he wanted -- "25 to 35 percent" of revenues -- was quite vague, as it represented a wide swing of value. Nor does Jenkins contend that he would have accepted a formula based upon two months' revenues.

Jenkins also focuses on the joint statement of undisputed facts filed by the parties. He chronicles a list of more than forty "facts" asserted by Bakst that Jenkins disputed, again urging that in those circumstances summary judgment necessarily must be denied.
This argument is also incorrect. Among other things, merely responding "disputed" to a proposed statement of fact does not establish a genuine dispute over a material fact. Rather, the party opposing summary judgment must adduce competent evidence sufficient to show a genuine issue for trial. Godbout v. Cousens, 396 Mass. 254, 261-262, 485 N.E.2d 940 (1985). See Superior Court Rule 9A (b) (5) (2018), as it was recently amended.

Because Morrison's liability was premised on the negligence of Bakst, which could not be established, summary judgment also was proper for Morrison.