SUPERIOR COURT 
 
 FBT EVERETT REALTY, LLC v. MASSACHUSETTS GAMING COMMISSION v. WYNN MA, LLC

 
 Docket:
 1881CV00304-B
 
 
 Dates:
 December 12, 2024
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 MIDDLESEX, ss.
 

 
 Keywords:
 DECISION AND ORDER ON FURTHER MOTIONS FOR SUMMARY JUDGMENT
 
 

 Wynn MA, LLC built the Encore Boston Harbor resort casino in Everett, Massachusetts, on land that it bought from FBT Everett Realty, LLC. At first, FBT contracted to sell the property to Wynn for $75 million if Wynn received a casino license. But staff in the Investigations and Enforcement Bureau (“IEB”) of the Massachusetts Gaming Commission learned that a convicted felon may have had an indirect ownership interest in FBT, which prompted the IEB to conduct an extensive investigation. Wynn was concerned that this could lead to a finding that it was not suitable to receive a casino license. Wynn told FBT that, in an effort to cure this problem, Wynn would pay no more than the land’s value for non-casino purposes. Wynn hired an appraiser that estimated the property was worth only $35 million if no casino could be built. FBT reluctantly agreed to sell to Wynn at that price. The Commission approved this solution and eventually gave Wynn a license.
FBT claims that the Commission made a regulatory taking of FBT’s property rights. In pressing this claim, FBT contends the evidence shows that IEB staff coerced Wynn into pressuring FBT to accept a $40 million price reduction by telling Wynn it would not be found suitable unless Wynn convinced FBT to cut the sales price to eliminate any casino-related premium.
FBT also claims, in the alternative, that Wynn engaged in fraud and committed unfair or deceptive trade practices in violation of G.L. c. 93A. When it argues in favor of these claims against Wynn, FBT takes the exact opposition position and contends the evidence supports a finding that the IEB never told Wynn it would be found unsuitable if it paid a casino premium for the Everett property,
 
                                                            -1-
 
and that Wynn falsely claimed the IEB said the agreed-upon purchase price would not be approved to coerce FBT into accepting a much lower price.
The Commission and Wynn have moved for summary judgment in their favor on these claims.
The Court will allow the Commission’s motion for summary judgment on the regulatory taking claim. Only final action by the Commission itself can give rise to liability on a regulatory taking theory. Even assuming that IEB staff made clear to Wynn that it would probably not be found suitable to receive a gaming license unless the price paid to FBT did not include a casino-related premium, it is undisputed that the Commission played no role in that alleged pressure and was not involved in considering the Option Agreement until after FBT had already agreed to the price reduction sought by Wynn.
The evidence obtained during discovery establishes that the Commission had nothing to do with pressuring or convincing FBT to sell the property at a lower price, therefore no action by the Commission had any adverse economic impact on FBT, and (as previously established) the price reduction did not interfere with any reasonable investment-backed expectations by FBT. All three of these factors weigh heavily against finding that the Commission did anything that constitutes a regulatory taking of FBT’s property interests. FBT’s remaining claim against the Commission therefore fails as a matter of law. It follows that Wynn is entitled to summary judgment on the Commission’s related claim against Wynn on a theory of unjust enrichment.[1]
The Court will deny Wynn’s motion for summary judgment with respect to FBT’s fraud and c. 93A claims. With respect to these claims, there is a material dispute as to whether the IEB told Wynn that its license application would be imperiled if Wynn paid a casino-related premium to FBT. The evidence would support findings that the IEB staff never said any such thing, that Wynn committed fraud and engaged in unfair and deceptive trade practices by falsely telling FBT that IEB staff were insisting that FBT accept a price cut to eliminate that premium, and that FBT reasonably relied on Wynn’s misrepresentations and suffered economic damage as a result.
 
--------------------------------------------
 
[1] The Court will not enter separate and final judgment on the claims by or  against the Commission. See Long v. Wichett, 50 Mass. App. Ct. 380, 388-404 (2000) (vacating entry of partial judgment that was inconsistent with “bedrock policy against premature and piecemeal appeals”).
 
                                                            -2-
 
1. Procedural Background. FBT originally sued only the Commission, seeking to recover the $40 million that FBT gave up to Wynn. The court (Kaplan, J.) dismissed FBT’s claims that the Commission’s actions constituted tortious interference with a contract, violated the Contract Clause of the United States Constitution, or were a per se taking of property. FBT’s remaining claim against the Commission is that it suffered a “regulatory taking” of its property rights because of pressure by IEB staff members.
The Commission then sued Wynn, asserting that if the Commission is liable to FBT then it is entitled to be fully compensated by Wynn. The court (Kaplan, J.) dismissed the Commission’s claims for contribution and indemnification. The unjust enrichment claim against Wynn is still pending. In this claim, the Commission contends that Wynn would be unjustly enriched if the Commission were found liable to FBT for the price reduction but Wynn were allowed to keep the benefit of that reduction.
In June 2021, this Court (Salinger, J.) granted summary judgment in the Commission’s favor on the regulatory taking claim because it concluded that FBT cannot prove that the Commission made a regulatory taking of a property right by interfering with reasonable investment-backed expectations.
The Supreme Judicial Court agreed that the Commission’s alleged role in pressuring FBT to accept a $40 million price cut did not interfere with any reasonable investment-backed expectations, but held that the Court erred in granting summary judgment without also considering the character of the Commission’s actions (if any) and the economic impact of those actions on FBT. See FBT Everett Realty, LLC v Massachusetts Gaming Commission, 489 Mass. 702, 703 & 709–713 (2022). The SJC remanded the case for completion of discovery on these other factors, explaining that “[o]nly when the disputed facts surrounding the commission's actions are fully developed and resolved will it be possible to properly decide FBT's regulatory taking claim.” Id. at 717. In addition, the SJC affirmed Judge Kaplan’s prior dismissal of FBT’s tortious interference claim, on the ground that the Commission is a public employer and is therefore immune from liability for intentional tort claims under the Massachusetts Tort Claims Act. Id. at 717–723.
After remand, the parties completed the further discovery contemplated in the SJC’s decision.
 
                                                            -3-
 
Based on that discovery, FBT sued Wynn for fraud and for violating G.L. c. 93A, § 11. FBT asserts that, if IEB staff testified accurately that they did not tell Wynn that its planned purchase of the property would be unacceptable if carried out pursuant to the terms originally agreed to by Wynn and FBT, then Wynn engaged in fraud by misrepresenting the IEB’s position as a ploy to pressure FBT into accepting a $40 million price cut.
2. FBT’s Regulatory Taking Claim. With that as background, the Court will now address the Commission’s motion for summary judgment as to FBT’s regulatory taking claim. This claim asserts that the “Commission’s forced reduction of the contract price by $40 million constitutes a regulatory taking” under the Fifth and Fourteenth Amendments to the United States Constitution[2] and under article 10 of the Massachusetts Declaration of Rights.[3] The summary judgment record shows that the Commission is entitled to judgment in its favor on this claim as a matter of law.
2.1. Legal Standards. The Court must apply the following legal rules or principles in deciding the Commission’s summary judgment motion.
2.1.1. Evaluating Alleged Regulatory Takings. Like the parties, the Court will evaluate FBT’s regulatory taking claim by applying the standards that have developed under Federal law.[4]
 
--------------------------------------------
 
[2] “The Fifth Amendment prohibition against the taking of private property for public use without just compensation applies against the States through the Fourteenth Amendment.” Texaco, Inc. v. Short, 454 U.S. 516, 523 n.11 (1982); accord Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 239 (1897).
[3] Though FBT also refers to the eminent domain statute (G.L. c. 79, § 10) in its amended complaint, that adds nothing to its regulatory takings claim. If the Commission’s actions do not constitute a taking of property, then the eminent domain statute is not implicated.
[4] The Supreme Judicial Court has followed Federal precedent when examining regulatory and other takings claims brought under article 10. See Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils., 467 Mass. 768, 775 n.8 (2014); Blair v. Department of Conservation and Recreation, 457 Mass. 634, 642–644 (2010). Since FBT does not argue that its regulatory takings claim might succeed under article 10 even if it fails under the United States Constitution, there is no need to explore whether in some circumstances different standards may apply under Massachusetts law. See Steinbergh v. City of Cambridge, 413 Mass. 736, 738 (1992); accord FBT Everett, 489 Mass. at 709 n.4.
 
                                                            -4-
 
The United States Constitution treats “physical takings” and “regulatory takings” of property differently. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 321–324 (2002). “When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner[.]” Id. at 322. In contrast, a regulatory taking “arises not from the acquisition of an interest in property by the government, but rather from a regulation” or other government action “that severely limits the property’s use.” Blair v. Department of Conservation and Recreation, 457 Mass. 634, 641 (2010). “While most restrictions on the use of private property do not constitute a taking, when a regulation substantially restricts the owner’s use of the property, so that the regulation ‘goes too far,’ it may be deemed a regulatory taking of that property for a public use,” in which case the property owner is entitled to fair compensation for the rights taken from it. Id., quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).
Two kinds of government action will almost always constitute a regulatory taking of property. “Government regulatory actions may be deemed per se takings if a regulation causes a permanent physical invasion” of private property, “or if the regulation deprives a property owner of any viable economic use of the property.” Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils., 467 Mass. 768, 776 (2014) (internal citation omitted); accord Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015–1016 (1992).
This case does not fall into either of these categories, which is why Judge Kaplan dismissed FBT’s claim of a per se regulatory taking.
“To determine whether a government restriction on an owner’s use of property has effected a compensable taking” in a case like this, “where the restriction involves neither a physical invasion nor a complete deprivation of economically viable use,” courts must consider and balance three factors: “the economic impact of the regulation, its interference with reasonable investment- backed expectations, and the character of the government action.” FBT Everett, 489 Mass. at 708, quoting Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2072 (2021). These are often referred to as the “Penn Central factors,” because they were first identified by the Supreme Court in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). See FBT Everett, supra, at 708 & 711.
A determination of whether there has been a regulatory taking “rests on ‘the particular circumstances’ in each case after ‘an essentially ad hoc, factual
 
                                                            -5-
 
inquiry’ ” focusing on these three factors. Giovanella v. Conservation Comm’n of Ashland, 447 Mass. 720, 725 (2006) (cleaned up), quoting Penn Central, supra; accord Tahoe-Sierra Preservation Council, 535 U.S. at 322; FBT Everett, supra.
2.1.2. Granting Summary Judgment. The entry of summary judgment is appropriate if, and only if, “viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.” Nelson v. Salem State College, 446 Mass. 525, 530 (2006), quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).
“The purpose of summary judgment is to decide cases where there are no issues of material fact without the needless expense and delay of a trial followed by a directed verdict.” Correllas v. Viveiros, 410 Mass. 314, 316 (1991).
On a motion for summary judgment the Court “must … draw all reasonable inferences” from the evidence “in favor of the nonmoving party,” as a fact finder would be free to do at trial. Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 119 (2010); see also O’Connor v. Redstone, 452 Mass. 537, 540 (2008) (in deciding motion for summary judgment, “[t]he judge views the evidence indulgently in favor of the nonmoving party and without considering witness credibility, weighing the evidence, or making findings of fact”).
A factual dispute will preclude summary judgment only where it is material to the outcome; “the dispute is not ‘material’ if one can assume the facts as contended by the nonmoving party, and on those assumed facts the moving party still must prevail as a matter of law.” Jenkins v. Bakst, 95 Mass. App. Ct. 654, 660 (2019). Thus, “to the extent the record includes disputed evidence,” the Court may “consider that evidence in the light most favorable” to FBT, as the nonmoving party, and determine whether the Commission is entitled to judgment as a matter of law if the evidence is construed in that manner. See O'Keeffe v. Dwyer & Duddy, P.C., 100 Mass. App. Ct. 671, 671 (2022) (affirming summary judgment), quoting Cesso v. Todd, 92 Mass. App. Ct. 131, 132 (2017); accord Nelson, 446 Mass. at 535 (affirming summary judgment).
2.2. Factual Background with Inferences Drawn against the Commission. When construed in the light most favorable to and if one draws all reasonable inferences in favor of FBT, the summary judgment record shows that the following facts are undisputed or that the Court must treat them as being undisputed for the purpose of deciding the Commission’s motion.
 
                                                            -6-
 
2.2.1. FBT Acquires the Property. This lawsuit concerns certain real estate in Everett, Massachusetts. FBT bought the property for $8 million in late 2009. The property was heavily contaminated and needed extensive environmental remediation. When FBT bought the property, casino gaming was illegal in Massachusetts. See G.L. c. 271, §§ 3, 5, 7, 8; FBT Everett, 489 Mass. at 704.
2.2.2. The Original Option Agreement. Two years after FBT acquired the property, the Governor signed legislation that established a new Massachusetts Gaming Commission and authorized it to license several casinos. FBT Everett, supra.[5] This new law divided Massachusetts into three regions and authorized a single “category 1” license for a destination resort casino in each region. See G.L. c. 23K, § 19(a)(1); FBT Everett, supra. Everett is in Region A, which consists of Suffolk, Middlesex, Essex, Norfolk, and Worcester counties. Id.
After this statute took effect, Wynn became interested in FBT’s Everett property as a possible site for a resort casino. Wynn entered into an Option Agreement with FBT in late 2012. Wynn agreed to pay FBT $100,000 each month in exchange for acquiring and maintaining the right, but not any obligation, to buy the property for $75 million if the Commission awarded the Region A Category 1 casino license to Wynn. This purchase price reflected a substantial premium over what the property would have been worth for a non-casino use.
The Option Agreement addressed how to allocate future environmental remediation costs, as follows.
o FBT agreed (in § 5.7.1) that it would be solely responsible for obtaining and paying for environmental cleanup work sufficient to achieve a “Permanent Solution” that met the requirements of the Massachusetts Contingency Plan, “consistent with [Wynn’s] proposed use and development of the Property and acceptable to [Wynn] in its reasonable discretion.”[6] FBT was obligated to have that
 
--------------------------------------------
[5] See also St. 2011, c. 194, § 16, which enacted G.L. c. 23K. This statute was approved by the Governor on November 22, 2011. It exempted casinos licensed under c. 23K from the statutes that otherwise make it a crime to operating a gaming establishment in Massachusetts. See G.L. c. 271, §§ 3, 5, 7, 8, as amended by St. 2011, c. 194, §§ 53, 54, 57, 58.
[6] The Massachusetts Contingency Plan is a set of regulations promulgated by the Massachusetts Department of Environmental Protection (“MassDEP”) to implement  the  environmental  cleanup process  required  under  G.L.  c. 21E,
<continued…>
 
                                                            -7-
 
work completed before closing on the sale to Wynn. The Option Agreement placed no cap on FBT’s liability for achieving a Permanent Solution.
o Wynn and FBT agreed (in § 5.7.6) to pay 50 percent each of any “Incremental Environmental Costs” incurred due to Wynn’s development and use of the property, such as increased costs incurred to dispose of contaminated soil, groundwater or sediments. The parties agreed that FBT’s share of such incremental costs would be subject to an unspecified, “to-be-determined” cap or upper limit.
o Wynn and FBT agreed (again in § 5.7.6) to enter into a mutually agreeable “Environmental Cost-Sharing Agreement” that would specify the cap on FBT’s share of Incremental Environmental Costs, and to do so no later than a defined “Environmental Condition Date.” The parties also agreed to maximize any environmental cost recovery under a judgment against a former owner of the property, Pharmacia Corporation, and that the full recovery under that judgment would be assigned to Wynn unless the parties agreed otherwise in their Environmental Cost-Sharing Agreement.[7]
 
--------------------------------------------
 
§ 3(b). See Peterborough Oil Co., LLC v. Department of Environmental Protection, 474 Mass. 443, 446 (2016). “The MCP creates a multiphased assessment and cleanup process whereby a contaminated site can reach either a ‘temporary’ or a ’permanent’ solution. A temporary solution means that the site has achieved a substantial elimination of hazardous material, but monitoring and mitigation efforts may remain ongoing indefinitely. A permanent solution means that, having been remediated, the site creates a condition of no significant risk to health, safety, public welfare, and the environment.” Id. at 446–447 (citations omitted).
[7] In June 2006, a federal judge held that Pharmacia was liable under G.L. c. 21E for 90 percent of the environmental remediation costs that had been incurred as of April 2006, and must share responsibility for future costs under a specified sliding scale providing that Pharmacia’s share would increase as additional funds  were  expended.   See   Mystic   Landing,   LLC   v.   Pharmacia   Corp., 443 F.Supp.2d 97, 108 (D.Mass. 2006) (Gorton, J.), reproduced as Ex. 72.
In December 2014, Pharmacia, FBT, and Wynn entered into an agreement implementing this judgment as follows. Pharmacia agreed to pay $8 million to FBT, which in turn agreed to pay Wynn $10 million, subject to the condition that $8 million of that amount would be held in escrow. The escrowed amount
<continued…>
                                                            -8-
 
The Option Agreement provided (in §§ 5.7.6 and 8.7) that if Wynn and FBT did not agree on how to allocate the Incremental Environment Costs by the Environmental Condition Date then either party could terminate the Option Agreement. Wynn and FBT kept extending that deadline, but never agreed on any cap on FBT’s share of the Incremental Environmental Costs.
However, neither side exercised any right to terminate the Option Agreement. Instead, as discussed below, in late November 2013 Wynn and FBT entered into a Ninth Amendment to the Option Agreement that reduced the purchase price and imposed a different cap on FBT’s environmental cleanup obligations.
2.2.3. The Investigation and Enforcement Bureau’s Role. In January 2013, after signing the original Option Agreement, Wynn filed its application for the Region A Category 1 gaming license. The IEB then began to investigate whether Wynn was suitable to receive such a license.
In early July 2013, IEB staff obtained recorded prison phone calls suggesting that a convicted felon with an extensive criminal record, who was friendly with a state prison inmate with ties to organized crime, might have a concealed ownership interest in FBT. These recordings triggered an extensive investigation by the IEB into the ownership of FBT. Several people who once had an interest in FBT asserted their Fifth Amendment right against self- incrimination when subpoenaed to testify before the IEB.
In response to the IEB’s inquiries, FBT provided a document purporting to show that the convicted felon had transferred his ownership interest in FBT to another person in August 2012, four months before Wynn and FBT entered into their Option Agreement. FBT’s owners all assured the IEB that the felon had in fact transferred his interest well before Wynn executed the Option Agreement.
But in October FBT’s manager conceded under oath, during testimony before IEB investigators, that this was not true. He admitted that this transfer of ownership interests did not actually take place until July 2013, that it occurred after FBT became aware of the IEB’s investigation into the ownership of FBT, and that FBT’s manager had falsely backdated the document to make it look like the former owner had signed it almost a year earlier.
 
--------------------------------------------
 
would be released to Wynn in stages; $6 million would be released when Wynn
filed a permanent solution statement with MassDEP for the upland area of the property, and the other $2 million would be released when Wynn filed a similar statement for the entire property. See Ex. 87, ¶ 3.
 
                                                            -9-
 
During this investigation, IEB staff considered, but never discussed with any of the Commissioners, whether the IEB could condition Wynn’s receipt of a casino license on the elimination of any casino-related premium from the purchase price to be paid to FBT for the Everett property. The IEB also considered, but again did not discuss with the Commission, whether the Commission could require that the casino premium be paid to the Commission on behalf of the Commonwealth, rather than to FBT.
IEB staff met or spoke with Wynn representatives at least ten different times about the FBT land transaction and the threat it posed to Wynn being found suitable to receive a casino license. In October 2013, the IEB played the prison phone call recordings for Wynn, which understood that the IEB did so because a hidden criminal interest in FBT could be inconsistent with Wynn being found to be suitable as an application for a gaming license. At around the same time the IEB played the same recordings for members of FBT.
During the IEB’s communications with Wynn about whether someone with a criminal record may still hold an indirect ownership interest in FBT, IEB staff conveyed to Wynn their belief that FBT’s principals should not profit from the legalization of casino gaming in Massachusetts by earning a casino-related premium on the sale of FBT’s property to Wynn. IEB staff made clear to Wynn during the Fall of 2013 that, given the evidence suggesting that someone with a significant criminal history had held an indirect ownership interest in FBT, and that FBT had tried to conceal that fact, the IEB’s evaluation of Wynn’s suitability would be adversely affected if FBT was to earn a casino-related premium for selling the property to Wynn.[8]
 
--------------------------------------------
 
[8] The Commission disputes FBT’s assertion that IEB staff told Wynn it needed to reduce the purchase price of the Everett property to eliminate any casino-relate premium. It points in part to testimony by Wynn’s General Counsel, and by the Chief Financial Officer and General Counsel of Wynn’s parent company, that the idea to renegotiate the Option Agreement price to eliminate any casino- related premium originated solely within Wynn, and not with the IEB.
But FBT has presented evidence that would support a contrary inference that IEB staff made clear to Wynn that the IEB was unlikely to recommend that the Commission find Wynn to be suitable for a casino license if the casino premium was not taken out of the purchase price to be paid to FBT.
For the purpose of deciding the Commission’s summary judgment motion, the Court will resolve this factual dispute by construing the relevant evidence in
<continued…>
 
                                                            -10-
 
The IEB also made clear to Wynn that the Commission had not yet deliberated about the issue, which meant that the IEB did not know whether the Commission shared the IEB’s views.
The IEB ultimately concluded in its December 2013 report to the Commission that FBT had withheld material information, FBT’s manager had provided false and deceptive documents and information about who held ownership interests in FBT and when they did so, and one person with an ownership interest in FBT had tried to conceal his role because he had a significant criminal history. The IEB also concluded that Wynn did not participate in or have any knowledge of FBT’s wrongdoing. This report was issued after FBT had agreed to reduce the purchase price for the Everett property.
2.2.4. Wynn’s Renegotiation. Wynn first discussed the IEB’s concerns with FBT during a meeting on September 27, 2013. Wynn told FBT that if it did not cooperate in fixing the problem then Wynn could be found unsuitable to receive a license. In making this point, Wynn’s general counsel said that FBT needed to do whatever Wynn said was necessary to fix the problem, or whatever the IEB or the Commission required, and that if FBT refused then Wynn was “going to sue you back to the stone ages.”
Several weeks later, during a conference call on October 22, 2013, Wynn told FBT that IEB staff was insisting that the Option Agreement be renegotiated to eliminate any casino-related premium from the purchase price for the property. Wynn also told FBT that it would be seeking an appraisal of the property based on assumptions that the land was made free of environmental contamination and could not be used for a casino resort. In addition, Wynn told FBT during this call that if FBT did not agree to reduce the property’s sale price to eliminate any casino-related premium, then the IEB was going to deem Wynn unsuitable for a casino license, Wynn would not close on the purchase of the property, and Wynn would sue FBT and its principals for all resulting economic damage.
Wynn reiterated some of these points in writing. On November 6, 2013, Wynn wrote to FBT stating that the IEB had informed Wynn that purchase of the Property pursuant to the terms of the then-current Option Agreement would not be acceptable. Wynn also confirmed in this letter that it had commissioned
 
--------------------------------------------
 
the light most favorable to FBT, because it is the nonmoving party. See Nelson, 446 Mass. at 535; O'Keeffe, 100 Mass. App. Ct. at 671.
 
                                                            -11-
 
an appraisal of FBT’s property to determine its fair market value on the assumption that it could not be used for a casino.
The appraiser hired by Wynn determined in late October 2013 that the highest and best non-casino use for the property was probably “large box retail.” It also concluded that, if the property was not used for gaming and the environmental contamination were adequately remediated, then fair market value of the property would be $35 million. FBT did not dispute this conclusion.
On November 18, 2013, FBT’s attorney met with the IEB’s director to discuss the possible reduction of the property’s purchase price to fair market value without a casino-related premium. FBT floated whether there were alternate remedies, like a blind trust arrangement, that would suffice to address concerns about who held beneficial interests in FBT. The IEB’s director made clear that in her view no other remedies would solve the problem, and that she was not sure whether the Commission would even accept Wynn paying FBT fair market value without a casino premium.[9] However, the IEB’s director did not say or suggest that the IEB had come up with the idea of reducing the purchase price to eliminate the casino premium, or that it had pressed or encouraged Wynn to pressure FBT to do so.
2.2.5. The Amended Option Agreement. FBT capitulated to Wynn’s demand and accepted the $40 million price reduction, in order to eliminate the so-called casino premium, because Wynn told FBT that the IEB was pressing for that to happen. FBT told Wynn in a later dated November 11, 2013, that it was accepting Wynn’s reports about its communications with the IEB without seeking independent verification.
On November 26, 2013, FBT and Wynn agreed to amend their Option Agreement to reduce the purchase price from $75 million to $35 million, and to cap FBT’s total liability for environmental cleanup at $10 million. This Ninth Amendment to Option Agreement provided in part that if the Commission were to approve the Option Agreement, as amended, then mutual releases by Wynn and FBT of all past or present claims of any kind would take effect.
The following week, on December 5, 2013, Wynn submitted a petition to the Commission asking it to accept the amended Option Agreement. The next day,
 
--------------------------------------------
 
[9]        See Wynn’s Statement of Material Facts, ¶¶ 24–25, and exhibits cited therein.
 
                                                            -12-
 
the IEB submitted its final report regarding its suitability investigation of Wynn to the Commission. The report addressed the FBT ownership issues.
Only the Commission had the authority to approve Wynn’s proposal to reduce the purchase price. The IEB informed Wynn that the IEB did not have the authority to approve Wynn’s proposal. And the IEB did not know and never offered any opinion to Wynn or FBT as to whether the Commission would approval the proposal.
2.2.6. The Commission’s Role. The Commissioners of the Massachusetts Gaming Commission played no role whatsoever in the price reduction that Wynn extracted from FBT.
The Commission first learned from IEB staff that someone with a criminal record may have an ownership interest in FBT during an executive session in early August 2013. The Commission received confidential updates on this issue from IEB staff on August 22 and September 19, 2013.
On December 13, 2013, several weeks after FBT’s and Wynn’s November 26 agreement to amend their Option Agreement to reduce the purchase price, the Commission held its first public meeting to discuss the IEB’s investigation into who held direct or indirect ownership interests in FBT.
During this public meeting, the IEB’s director gave an oral report summarizing the IEB’s investigation and conclusions regarding these issues. She confirmed that the IEB had briefed Wynn on what the IEB had uncovered, and had made clear to Wynn that she was concerned by the evidence that someone with a criminal record held an indirect ownership interest in FBT, and also that the Commission had not yet deliberated on the matter. The director also made clear she believed that Wynn’s “position regarding the sellers receiving a financial windfall as a result of the gaming facility was something the IEB would report on regarding [Wynn’s] suitability” for a gaming license; however, the director did not say that the IEB ever told Wynn it would be taking this into account.
Later during this meeting, the Commission discussed and voted to accept the amendment to the Option Agreement as a resolution of the land ownership issues identified by the IEB. It also voted to require certificates from FBT members regarding whether anyone else held ownership interests in FBT, and directed the IEB to forward its investigatory materials to State and Federal law enforcement officials.
 
                                                            -13-
 
At no time before this December 13 meeting and vote did the Commission ever discuss, consider, or make any decision as to any potential remedies, solutions, or any other restrictions regarding the sale of the Property from FBT to Wynn. Nor did the Commission or any Commissioner ever communicate to the IEB, to Wynn, or to anyone else before the December 13 meeting that Wynn would have to convince FBT to reduce the purchase price for the Property in order for Wynn to be found suitable to receive a casino license.
Ten months later, in September 2014, the Commission awarded the Region A Category 1 license to Wynn, which then exercised its option to acquire the property from FBT at the reduced price.
2.3. Analysis of the Regulatory Taking Claim. The summary judgment record establishes that FBT cannot prove its regulatory taking claim against the Massachusetts Gaming Commission, because all three Penn Central factors weigh heavily against finding that the Commission took any action that could constitute a taking of property from FBT.
FBT’s assertion that “[t]he SJC’s earlier decision in this case forecloses the Commission’s present motion for summary judgment” is without merit. The SJC made clear that its conclusions were “based on the limited discovery that has occurred so far” and specifically “remand[ed] FBT’s regulatory taking claim to the Superior Court to allow the completion of discovery and further proceedings consistent with this opinion.” FBT Everett Realty, 489 Mass. at 705 & 717. It emphasized that “[o]nly when the disputed facts surrounding the commission’s actions are fully developed and resolved will it be possible to properly decide FBT’s regulatory taking claim.” Id. at 717.
Since the more robust evidentiary record presented by the parties now is very different from the one previously reviewed on appeal, the SJC’s determination that summary judgment was inappropriate on the prior record does not control whether it is appropriate on the current record. Cf. Kitras v. Town of Aquinnah, 474 Mass. 132, 146 (2016) (issue decided on appeal may be reopened after remand if evidence after subsequent proceedings is substantially different).
2.3.1. No Governmental Action by the Commission. The factor concerning the character of the governmental action weighs heavily against finding a regulatory taking here, because it is undisputed that the Gaming Commission never took any final action—or even any preliminary action—to compel Wynn not to pay a casino-related premium to FBT. Though there is evidence
 
                                                            -14-
 
suggesting that IEB staff made clear to Wynn that its application would fail unless it could convince FBT to agree to reduce the property’s purchase price to eliminate any casino premium, the Commission was not aware of and had no involvement in those efforts by IEB staff.
FBT improperly conflates the IEB staff with the Gaming Commission itself. No urging by IEB staff to eliminate any casino-related premium from the price to be paid to FBT could constitute a regulatory taking because it did not constitute final action by the Commission.
In evaluating whether there has been a regulatory taking, a court must consider only the character and impact of a final action by the relevant governmental decisionmaker. “A regulatory takings case becomes ripe for adjudication only after … the responsible government entity has reached ‘a final decision regarding the application of the regulation to the property at issue’ ” (cleaned up). Giovanella v. Conservation Comm’n of Ashland, 447 Mass. 720, 723 (2006), quoting Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985). In other words, there must have been a final decision by “the government entity charged with implementing the regulations” or statute at issue. Commonwealth v. Blair, 60 Mass. App. Ct. 741, 746, rev. denied, 442 Mass. 1101 (2004), quoting Daddario v. Cape Cod Comm’n, 425 Mass. 411, 414 (1997), quoting in turn Williams County, supra. Agency action that falls short of “a final and authoritative determination” as to the nature and scope of legally permitted use of property cannot constitute a regulatory taking of the property. Daddario, quoting MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 348 (1986).[10]
Here, the Massachusetts Gaming Commission is the responsible government entity and had sole and exclusive power to implement the governing statute. The Commission consists of five commissioners and can act only by a vote of at least three commissioners. G.L. c. 23K, §§ 3(a), 3(d). Although the IEB is charged with investigating the suitability of each applicant for a gaming license (see G.L. c. 23K, § 12(a), and 205 Code Mass. Regs. 105.01(1)), it may only make a recommendation as to suitability; the Commission must decide for itself
 
--------------------------------------------
 
[10] “[W]hile there is a narrow futility exception to the requirement for a final decision before a takings claim is ripe, ‘to come within that exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).’ ” Daddario v. Cape Cod Comm’n, 56 Mass. App. Ct. 764, 770 (2002), quoting Gilbert v. Cambridge, 932 F.2d 61 (1st Cir. 1991).
 
                                                            -15-
 
whether an applicant is suitable and, if so, to review the applicant’s entire application. See G.L. c. 23K, § 12(c); 205 Code Mass. Regs. § 115.05. It was up to the Commission, and not to IEB staff, to decide whether to approve Wynn’s option agreement to purchase the Everett property from FBT. See G.L. c. 23K, § 21(b); 205 Code Mass. Regs. §§ 116.08(1), 116.09(1), & 116.10(1). And it was similarly up to the Commission, and not to the IEB or any other staff, to decide whether to issue a gaming license to Wynn or to any other applicant. See G.L. c. 23K, § 17(e)–(g), § 19(a); 205 Code Mass. Regs. §§ 116.01 & 119.03.
The IEB therefore had no independent power to determine whether Wynn was suitable to obtain a casino license, or to approve or disapprove any contract between Wynn and FBT. Only the Commission, acting by majority vote of the Commissioners, could do so. As a result, the IEB had no ability to force Wynn to reduce the price it would pay for the Everett property to eliminate any casino premium. As the Commission aptly notes in its reply memorandum, “[t]he IEB did not, and could not, impose any such requirement on Wynn.
The Commission never made a final and authoritative decision that it would not approve Wynn’s contract with FBT unless the negotiated purchase price were reduced by $40 million. That is not in dispute. Indeed, it is undisputed that the Commission took no action at all with respect to Wynn’s Option Agreement until several weeks after FBT had executed the contract amendment containing the price reduction.
Since “[a] final decision is an essential element of a regulatory taking claim,” and it is undisputed that the Commission did not make any final decision before FBT accepted the price reduction sought by Wynn, the Commission is entitled to summary  judgment in its favor on this ground alone.  See  Blair,  60 Mass. App. Ct. 745–749 (affirming summary judgment on ground that regulatory taking claim was not ripe under Penn Central test because property owner did not seek variance from application of Watershed Protect Act regulations and thus did not obtain a final agency decision).
In any case, since the evidence viewed in the light most favorable to FBT establishes that the Commission “merely accepted” a reduction in the price that Wynn was to pay FBT “as a cure to its concerns about undisclosed criminal ownership interests at FBT,” and that the Commission never took any action to direct or compel such a result, the character of the Commission’s actions weighs heavily against finding that a regulatory taking occurred. Cf. FBT Everett, 489 Mass. at 715.
 
                                                            -16-
 
The parties dispute whether IEB staff told Wynn that the IEB would likely not find it to be suitable to receive a gaming license unless Wynn could convince FBT to accept a lower price that did not include any casino-related premium (as FBT contends when pressing its claim against the Commission), or whether the IEB merely informed Wynn about the concerns as to whether a felon had an indirect ownership interest in FBT and Wynn decided on its own that it could cure the problem only if FBT agreed to forego a casino premium (as the Commission contends).
But this factual dispute is not material because the Commission is entitled to judgment as a matter of law even construing this evidence in the manner suggested by FBT.
Although there is evidence suggesting that IEB staff advised Wynn the IEB’s evaluation of Wynn’s suitability would be adversely affected if FBT was to earn a casino-related premium for selling the property to Wynn, that advice had no legal effect because it was not a final decision or other action by the Commission. It is therefore “not a form of coercive government action at all, but at most a form of ‘persuasion,’ ” a distinction that “weighs strongly against finding a regulatory taking.” Taylor v. United States, 959 F.3d 1081, 1089 (Fed. Cir. 2020) (advice by Air Force officials that Federal Aviation Administration would likely not issue “no hazard” determination, which was required to erect wind turbines on plaintiff’s land, “falls into no category of governmental action we have recognized as supported a regulatory-taking claim”).
2.3.2. No Economic Impact of any Commission Action. The factor concerning the economic impact of the Commission’s actions also weighs heavily against finding that there was a regulatory taking, because it is undisputed that the Commission did nothing that caused FBT to suffer any economic loss.
Economic impact is relevant to a regulatory taking claim only if it was “caused by” the challenged governmental action; a “ ’diminution in property value, standing alone’ does not establish a taking.” FBT Everett, 489 Mass. at 713, quoting Penn Central, 438 U.S. at 124. In other words, under the Penn Central factors there is no regulatory taking unless some economic injury was “caused by the government action at issue, not by some other factor.” Love Terminal Partners, L.P. v. United States, 889 F.3d 1331, 1345 (Fed. Cir. 2018).
Thus, to succeed on its regulatory taking claim, FBT must be able to show that it was an “action of the commission, rather than Wynn, that caused economic
 
                                                            -17-
 
loss to FBT” (emphasis in original). FBT Everett, 489 Mass. at 713. In a case like this, where a taking claim is based on allegations that the government “pressure[d] a third party to take action that diminishes the value of the plaintiff’s property, the government is responsible … for the economic impact of the third party’s action if the economic harm to the plaintiff ‘was direct and intended’ and ‘the government’s influence over the third party was coercive rather than merely persuasive.’ ” FBT Everett,  489 Mass. at 713–714, quoting  A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1154 (Fed. Cir. 2014).
As discussed above, it is undisputed that FBT contractually agreed to a $40 million price cut before the Commission ever considered or voted on whether to approve the Option Agreement. Since the Commission did nothing to coerce Wynn and did nothing that caused FBT to suffer economic loss, this factor weighs heavily against finding that there was a regulatory taking.
2.3.3. No Reasonable Investment-Backed Expectations. Finally, it is the law of the case that “the reasonable investment-backed expectations factor weighs heavily against the finding of a regulatory taking” of FBT’s property interests. FBT Everett, 489 Mass. at 713.
Since casino gaming was illegal in Massachusetts when FBT bought the Everett property, FBT “could not reasonably have expected to sell the property as a site for the development of a casino.” Id. at 712. That would be true even if FBT believed at  the  time  that  casino  gambling  would  be  legalized,  because  a “ ’starry eyed hope of winning the jackpot if the law changes’ does not give rise to reasonable investment-backed expectations.” Id., quoting Bridge Aina Le'a, LLC v. State of Hawaii Land Use Comm'n, 950  F.3d 610, 633 (9th  Cir. 2020)     (en banc), cert. denied, 141 S.Ct. 731 (2021).
Nor could FBT’s further investments in the property after casino gaming was legalized in Massachusetts “give rise to reasonable investment-backed expectations because they remained subject to the long-shot gamble that a gaming license would be awarded to develop a casino on the Everett parcel.” FBT Everett, 489 Mass. at 712–713. The Massachusetts gaming act provides that the Commission “shall have full discretion as to whether to issue a license” and that applicants “have no legal right or privilege to a gaming license.” G.L. c. 23K, § 17(g). “Given the commission’s very broad discretion, FBT could not reasonably have expected that Wynn would be awarded a region A casino gaming license.” FBT Everett, supra, at 713.
 
                                                            -18-
 
2.3.4. Balancing the Penn Central Factors. In sum, the revised summary judgment records establishes that all three Penn Central factors point in the same direction and weigh heavily against finding that there was a regulatory taking. When the Court considers and balances the Penn Central factors, based on undisputed facts and construing any disputed facts in the light most favorable to FBT, it is apparent that the Commission is entitled to judgment in its favor as a matter of law, as no reasonable fact finder could conclude that the Commission took any action that constitutes a regulatory taking of property from FBT.
2.3.5. The Commission’s Unjust Enrichment Claim against Wynn. Wynn argues that, if the Commission obtains summary judgment on FBT’s remaining claim, then the Commission would have no basis for pressing its unjust enrichment claim against Wynn. And the Commission seems to agree, as it has not opposed Wynn’s conditional motion for summary judgment on the unjust enrichment claim. The Court will therefore allow this part of Wynn’s motion.
3. FBT’s Claims against Wynn. Let’s turn now to FBT’s separate claims against Wynn for intentional fraud and under G.L. c. 93A, § 11. The Court concludes that Wynn is not entitled to summary judgment in its favor on these claims.
3.1. Factual Background with Inferences Drawn against Wynn. For the purpose of deciding Wynn’s motion for summary judgment, the record establishes the same facts or supports drawing the same inferences that are set out in §§ 2.2.1 through 2.2.6 above—with one significant exception.
As discussed in § 2.2.3 of this decision, the Commission and FBT dispute whether IEB staff ever told Wynn that it would not be found suitable to obtain a gaming license if it paid FBT a casino-related premium as part of the purchase price for the Everett property. When considering the Commission’s summary judgment motion, the inference favorable to FBT was that IEB staff did in fact convey that message.
In contrast, when considering Wynn’s motion, the inference favorable to FBT is the exact opposite, that the IEB staff never told or suggested to Wynn that it could not obtain a license unless it convinced FBT to agree to a substantial price reduction that eliminated the casino premium.
Wynn implicitly concedes this point. This makes sense because, as noted above, Wynn’s General Counsel, as well as the Chief Financial Officer and General Counsel of Wynn’s parent company, all testified under oath at their depositions
 
                                                            -19-
 
that the idea to renegotiate the Option Agreement price to eliminate any casino- related premium originated solely within Wynn, and not with the IEB.
Though Wynn asserts there is no evidence that it made any false statements or representations to FBT, it bases that argument on the assertion that there is no competent evidence that Wynn ever told FBT that the IEB staff had made clear that Wynn’s application would fail if the Option Agreement continued to include a casino-related premium in the purchase price. But Wynn does not contend that if Wynn made such statements to FBT they would have been true.
In sum, for the purpose of deciding Wynn’s motion, the Court must construe the summary judgment record as showing that: (1) IEB staff did not convey to Wynn their belief that FBT’s principals should not profit from the legalization of casino gaming in Massachusetts by earning a casino-related premium on the sale of FBT’s property to Wynn; and (2) IEB staff did not make clear to Wynn during the Fall of 2013 that the IEB’s evaluation of Wynn’s suitability would be adversely affected if FBT was to earn a casino-related premium for selling the property to Wynn.
3.2. Fraud Claim. To recover on its claim for intentional misrepresentation or fraud, FBT will have to prove that Wynn “made a false representation of material fact, with knowledge of its falsity, for the purpose of inducing” FBT “to act on this representation,” that FBT “reasonably relied on the representation as true,” and that FBT “acted upon it to [its] damage.” Cumis Ins. Society, Inc., 455 Mass. 458, 471 (2009).
Wynn argues that FBT cannot prove key elements of this claim because the evidence establishes that Wynn’s representations about its communications were all true, FBT did not rely (or at least did not reasonably rely) on Wynn’s representations, and FBT cannot prove that it suffered any compensable injury. The Court concludes that these arguments are without merit.
If a factfinder were presented at trial with the evidence in the summary judgment record it could reasonably conclude that FBT has proved each of these elements. Wynn is therefore not entitled to summary judgment on its fraud claim. See generally Flesner v. Technical Communications Corp., 410 Mass. 805, 811-812 (1991) (“Where a jury can draw opposite inferences from the evidence, summary judgment is improper.”); Dennis v. Kaskel, 79 Mass. App. Ct. 736, 741 (2011) (summary judgment may not be granted where “a
 
                                                            -20-
 
reasonable jury could return a verdict for the nonmoving party” (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).
Although the November 2013 contract amendment reducing the purchase price includes a general release of all possible claims by FBT against Wynn, whether that release is enforceable cannot be resolved at this time. If FBT can prove that it was induced to enter into the contract amendment and release due to fraud by Wynn, the general release would be voidable. See Shaw's Supermarkets, Inc. v. Delgiacco, 410 Mass. 840, 842 (1991); Green v. Harvard Vanguard Medical Assoc., Inc., 79 Mass. App. Ct. 1, 11 (2011).
3.2.1. False Statements. The summary judgment record contains sufficient evidence that Wynn represented to FBT that the IEB was insisting that the casino premium had to be eliminated or Wynn would not be found to be suitable for a gaming license, and that this representation was false.
Dustin DeNunzio testified under oath at his deposition that in October 2013, when DeNunzio was manager and one of the three remaining owners of FBT, Wynn’s general counsel met with DeNunzio and told him that the IEB was insisting the sale price be reduced to eliminate the casino premium or Wynn would not be found suitable, and that Wynn would sue FBT if it did not agree to the price cut. Wynn’s assertion that “there is no evidence in the record” indicating that Wynn told FBT in October 2013 that the IEB was requiring a reduction in purchase price as a condition of suitability is simply wrong.
Wynn’s general counsel sent DeNunzio a letter on November 6, 2013, that arguably corroborates DeNunzio’s testimony about the prior meeting. In this letter, Wynn’s general counsel wrote:
As previously communicated, we have been informed by the Division of Investigation/Enforcement of the Massachusetts Gaming Commission (the “ MGC”) that the members of FBT have failed to cooperate and/or have provided unsatisfactory testimony to the MGC. As a direct result of this failure to cooperate, the MGC has informed us that our purchase of the Property pursuant to the terms of the current Option Agreement will not be acceptable. Moreover, if we are unable to resolve this matter prior to the deadline to submit our response to the MGC’s RFA-2 Application due on December 31, 2013, we will not be eligible to receive a Casino License.
            *   *   *
 
                                                            -21-
 
The MGC has informed us that we are unable to proceed with the purchase of the Property as set forth in the Option Agreement. In addition, our internal compliance committee has serious concerns regarding the proposed transaction as it currently exists. As a result, with your approval, we have engaged Colliers International Valuation & Advisory Services to prepare an appraisal of the Property with the assumption that it will not be used for gaming purposes. We have been informed that we should be receiving the appraisal this week and we will share it with you upon receipt.
Since the letter defines “MGC” to mean the IEB, each reference in this letter to the MGC is actually a reference to the IEB.
Wynn contends that this letter proves nothing, because it “does not state anywhere that the Commission (or the IEB) was requiring a reduction in purchase price as a condition of suitability.”
But at trial a factfinder could reasonably infer that this letter, when read as a whole and considered in light of DeNunzio’s testimony about his prior meeting with Wynn’s general counsel, was intended to and did imply that the IEB told Wynn it needed to get FBT to reduce the purchase price to eliminate any casino premium. That is a fair inference since the letter came on the heels of the late October meeting in which Wynn (allegedly) told FBT that the IEB was insisting on elimination of the casino premium, and the letter discusses the process for achieving that goal (through an appraisal that would assume the property would not be used for gaming purposes).
“Fraud or deceit ‘may be perpetrated by an implied as well as by an express representation.’ ” Briggs v. Carol Cars,  Inc., 407 Mass.  391, 396 (1990), quoting Robichaud v. Owens-Illinois Glass Co., 313 Mass. 583, 585 (1943). And an inference “need only be reasonable and possible;” it does not have to be “necessary or inescapable.”  Parker   v.  EnerNOC,   Inc.,  484 Mass.   128,  132  (2020), quoting Commonwealth v. Kelly, 470 Mass. 682, 693 (2015).
There is also evidence that Wynn’s representations that the IEB told Wynn that it would not be found suitable if it paid FBT a casino-related premium were false. The IEB’s director testified under oath that the IEB never told Wynn that purchasing the property under the terms of the then-current Option Agreement would not be acceptable, but instead merely alerted Wynn to the concerning information that the IEB had uncovered while being “very specific” that it was up to Wynn to decide how to solve the problem. And Wynn’s Rule 30(b)(6)
 
                                                            -22-
 
witness confirmed that this was correct, testifying on behalf of Wynn that the IEB “firmly put the burden on us to come with a solution,” and that the IEB’s director told Wynn “many times” that “we can’t tell you what to do” and that “this is your problem to solve.”
3.2.2. Reasonable Reliance. Wynn’s argument that FBT could not have been relying on FBT’s alleged misrepresentations because it knew full well that the IEB was concerned about whether a convicted felon had an ownership interest in FBT is also without merit.
FBT does not dispute that by the Fall of 2013 it was well aware of the IEB’s investigation into who actually owned FBT. But that is not the same thing as being aware, as Wynn allegedly represented, that the IEB was demanding the property purchase price be reduced to eliminate any casino-related premium.
Similarly, when FBT’s counsel met with the IEB’s director in mid-November 2013, the director indicated that they did not know whether the Commission would accept an amended Option Agreement that eliminated any casino premium as a solution to concerns about who owned  or  had  owned  FBT.  As noted above, there is no evidence that the director revealed or suggested that the IEB had come up with the idea of reducing the purchase price to eliminate the casino premium, or that it had pressed or encouraged Wynn to pressure FBT to do so.
Wynn cannot defeat the fraud claim by trying to show that FBT did not make sufficiently efforts to learn whether IEB staff had pressured Wynn to seek a price reduction. “The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying on its truth,” even if they could have figured out that the representation was false had they “made an investigation.” Yorke v. Taylor, 332 Mass. 368, 374 (1955), quoting Restatement of Torts § 540 (1938); accord Zimmerman v. Kent, 31 Mass. App. Ct. 72, 81 (1991). As a result, FBT “cannot be faulted for having failed to investigate the truth or falsity” of Wynn’s alleged representations before signing the Ninth Amendment to Option Agreement. See Waste Management of Mass., Inc. v. Carver, 37 Mass. App. Ct. 694, 699 n.5 (1994).
FBT’s manager testified at his deposition that FBT agreed to the price reduction “with a gun held to our head,” and did so only “because Wynn told us that the IEB required this of us.” At trial the factfinder could credit such testimony,
 
                                                            -23-
 
Wynn has therefore not shown that it is entitled to summary judgment as to the element of reliance.
Under the circumstances of this case, whether FBT’s alleged reliance on Wynn’s alleged misstatements was reasonable is also a question that a jury or judicial factfinder must decide at trial, not something that the Court may resolve on summary judgment as a matter of law. Cf. Nova Assignments, Inc.  v. Kunian, 77 Mass. App. Ct. 34, 39 (2010) (summary judgment should not have been entered where reasonableness of reliance was question for jury to decide based on all facts and circumstances).
3.2.3. Damage. Wynn argues that FBT’s fraud claim fails for the further reason that FBT’s alleged damages “are purely speculative” because there is no way to tell what amount of money FBT would have been required to pay toward environmental remediation costs under the prior Option Agreement, and therefore no way to tell whether FBT would have made more or less profit under the prior contract than it did under the challenged contract amendment. Wynn argues that it never reached agreement with FBT as to the scope of work required either to achieve a Permanent Solution or to complete necessary Incremental Environmental Costs, regarding the “to-be-determined cap” on FBT’s share of the Incremental Environmental Costs, or on how to allocate the Pharmacia judgment.
The Court concludes that these arguments are also without merit.
Both the scope of work needed to achieve a Permanent Solution in cleaning up the property that would meet the standards established by the Massachusetts Contingency Plan, and the reasonable cost of that work, are proper subjects of expert testimony. FBT has presented such testimony. It will be up to the factfinder to determine at trial whether the cost estimate by FBT’s expert or some other amount is an appropriate estimate of the Permanent Solution cost. Although the original Option Agreement provided that Wynn had to approve of the Permanent Solution, it had to exercise “reasonable discretion” in doing so. It would not have been reasonable for Wynn not to accept a Permanent Solution that met the requirements of the MCP.
Much the same is true for the scope and cost of any Incremental Environmental Costs. Wynn and FBT have presented conflicting evidence as to what share of the actual costs incurred by Wynn count as “Incremental Environmental Costs”
 
                                                            -24-
within the meaning of the prior Option Agreement. That is a genuine dispute of material fact that will have to be resolved at trial.
Though Wynn and FBT never reached agreement as to an appropriate cap on FBT’s share of the Incremental Environmental Costs, that does not prevent FBT from establishing its damages due to Wynn’s alleged fraud either. The Option Agreement required that there be a cap on FBT’s liability for Incremental Environmental Costs, but left the details to be worked out later. Since the parties never agreed as to the specifics of this contract term, the trial judge will have to determine and supply a reasonable term based on evidence of all relevant circumstances presented at trial.
“When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.” President and Fellows of  Harvard College  v.  PECO  Energy Co.,  57 Mass. App. Ct 888, 896 (2003), quoting Restatement (Second) of Contracts § 204 (1979)). Doing so in this case will not involve any speculation as to what agreement Wynn and FBT might have reached if they had not executed the contract amendment that FBT contends was procured by fraud. Instead, where contracting parties did not agree upon an essential but missing contract provision, “the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.” Id., quoting Restatement § 204, comment d. The Appeals Court has described this as the “equitable insertion” of a “curative term.” Browning-Ferris Industries, Inc. v. Casella Waste Mgmt. of Massachusetts, Inc., 79 Mass. App. Ct. 300, 312 (2011).
Thus, if FBT were to prove the other elements of its fraud claim at trial, the trial judge will have to determine, based on all the circumstances, what reasonable cap on FBT’s liability for Incremental Environmental Costs should be inserted into the prior version of the Option Agreement. Since reformation of a contract is an equitable remedy, the parties have no right to have the issue decided by a jury. See Ross v. New England Mut. Ins. Co., 120 Mass. 113, 117 (1876); see generally Rosati v. Boston Pipe Covering, Inc., 434 Mass. 349, 350 (2001) (if plaintiff’s claim “ ’is analogous, in either subject matter or remedy sought, to cases within the court’s equity jurisdiction, as it existed at the time of the adoption of the Constitution,’ there is no right to trial by jury”) (quoting Dalis v. Buyer Advertising, Inc., 418 Mass. 220, 223 (1994)).
 
                                                            -25-
 
One of the circumstances that the trial judge will have to consider in making this decision is the amount that was recovered under the Pharmacia judgment. Wynn’s argument that the lack of a subsequent agreement with FBT on how to allocate the Pharmacia recovery precludes summary judgment on the fraud claim is without merit. The Option Agreement resolved the issue by providing (in § 5.7.6) that the full amount of the Pharmacia judgment would be assigned to Wynn, “unless otherwise agreed by the Parties in the Environmental Cost- Sharing Agreement.” This means that if the amended Option Agreement is voidable on account of fraud, then the full amount recovered under the Pharmacia judgment is to be credited to Wynn,[11] but the trial judge may consider that as a relevant circumstance in determining a reasonable cap on FBT’s liability for Incremental Environmental Costs.
Finally, to the extent that Wynn is arguing that the prior Option Agreement was automatically terminated and cannot be revived because the parties never agreed upon a mutually acceptable Environmental Cost-Sharing Agreement, that is incorrect. Wynn may have had the right to terminate the contract, but the summary judgment record establishes that Wynn never exercised that right. The Court concludes that the Option Agreement is unambiguous when considered as a whole, so its meaning is a question of law that the Court may decide on a summary judgment motion.[12] Sections 5.7.6 and 8.7, when read together, make clear that failure to agree on a final allocation of environmental costs would not trigger the automatic termination of the contract, but instead would merely give either party to the right to terminate the arrangement if it wished. Wynn concedes in its memorandum that “the Option Agreement provided that either party could walk away from the deal, with no termination fee, if they failed to reach an environmental cost-sharing agreement.”
Wynn did not have the option of accepting parts of the Option Agreement and selectively terminating others. “[U]nless rescinded ‘a voidable contract imposes on the parties the same obligations as if it was not voidable.’ ” Berenson
 
--------------------------------------------
 
[11] That is what in fact happened in 2014; FBT agreed to assign the full $8 million final recovery from Pharmacia to Wynn.
[12] See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002); Trustees of Beechwood Village Condominium Trust v. USAlliance Federal Credit Union, 95 Mass. App. Ct. 278, 284–285 (2019). “Whether a contract is ambiguous is also a question of law.” Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007).
 
                                                            -26-
 
v. French, 262 Mass. 247, 260-261 (1928), quoting Williston, Contracts, § 15 (1920). The same is true here.
Rather than exercise any right to terminate the Option Agreement, Wynn convinced FBT to revise the terms of the deal, bought the property, and built a resort casino there. Therefore, if FBT can prove at trial that the amended contract was procured by fraud, Wynn would be bound by the terms of the prior contract, as modified by the trial judge to supply the missing term as to a reasonable cap on FBT’s liability for Incremental Environmental Costs.
3.3. Chapter 93A Claim. Since FBT’s claim for intentional fraud survives summary judgment, so does its claim under c. 93A. See, e.g., Stolzoff v. Waste Sys. Int’l, Inc., 58 Mass. App. Ct. 747, 765 (2003).
As discussed above, if FBT succeeds in proving that Wynn procured the last Option Agreement amendment by fraud then Wynn will not be able to enforce the general release of all claims, including the c. 93A claim, contained in the amended contract. See Shaw's Supermarkets, 410 Mass. at 842 (1991); Green, 79 Mass. App. Ct. at 11.
ORDERS
The motion by the Massachusetts Gaming Commission for summary judgment on the regulatory taking claim by FBT Everett Realty, LLC (docket no. 78) is allowed. The motion by Wynn MA, LLC’s motion for summary judgment (docket no. 79) is denied in part with respect to FBT’s claims against Wynn for fraud and under G.L. c. 93A, § 11, and allowed in part with respect to the Commission’s claim against Wynn for unjust enrichment.
The Court will hold a final pre-trial conference concerning FBT’s claims against Wynn on February 27, 2025, at 2:30 p.m., in Suffolk Superior Courtroom 1017. FBT and Wynn shall file the required joint pre-trial memorandum, and provide a courtesy copy to the Court at Suffolk Superior Courtroom 1017, no later than February 14, 2025.